IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-30183

_____


LEO SHAPIRO,

Plaintiff - Appellee,

versus

JOHN J. KELLY; ET AL,

Defendants,

TEXTRON INCORPORATED,

Defendant - Appellant.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

Appeal from the United States District Court
for the Eastern District of Louisiana
(95-CV-4083)

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

April 1, 1998

Before HIGGINBOTHAM and STEWART, Circuit Judges, and WALTER,[*] District Judge.

PER CURIAM:[**]


At trial in the United States District Court for the Eastern District of Louisiana, a jury

returned a unanimous verdict in favor of Plaintiff-Appellee Leo Shapiro ("Shapiro") and against

_____

[*] District Judge of the Western District of Louisiana, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Defendant-Appellant Textron, Inc. ("Textron"), on Shapiro's Age Discrimination in Employment Act ("ADEA") claim of discriminatory termination based upon age.

Textron appeals. Finding no merit in Textron's arguments, we affirm.

I.

FACTS AND PROCEEDINGS

Shapiro was laid off by Textron, effective January 31, 1995, when Shapiro was seventy-three (73) years of age. Shapiro began working for Textron in New Orleans in March 1986, as a business manager, with what is now Textron's Marine and Land Systems Division. Shapiro was sixty-four (64) years old at that time. In February 1987, Shapiro was promoted to the position of Director of Program Planning and Control. It is agreed that Shapiro was a highly qualified employee and that his job performance was excellent. He received salary increases and bonuses throughout his tenure at Textron.

During 1987, James Kratzer ("Kratzer"), Textron's Executive Vice President of Finance, became Shapiro's immediate supervisor. In a 1991 performance appraisal of Shapiro, Kratzer wrote: "Mr. Shapiro's job performance certainly indicates that he is promotable to a higher level position in program management, however, his age is a factor in this consideration. It is noted that considering the age factor, Mr. Shapiro's longer-term opportunities for promotion are somewhat limited." Further, Kratzer wrote: "There are no qualified replacements within the organization and the Division is currently searching for a manager who can be developed to succeed Mr. Shapiro." At that time Shapiro had indicated no desire to retire.

In his May 1992 appraisal of Shapiro's performance, Kratzer wrote: "Would desire that Mr. Shapiro accelerate the development of a qualified replacement."

2

In January 1994, Kratzer offered Robert Akroyd ("Akroyd"), eighteen (18) years younger than Shapiro, a position in Shapiro's department. In April 1994, Textron's Marine Systems Division, in which Shapiro was employed, underwent a merger with Textron's Cadillac Gage Division.

In June 1994, Kratzer began asking Shapiro about his retirement plans and began speaking about Kratzer's need to find a replacement for Shapiro. Despite Shapiro's insistence that he told Kratzer that he had no plans to retire, in a September 1994 performance appraisal of Shapiro, Kratzer suggested that "Mr. Shapiro may be near retirement and would not be considered for further promotion." Further, the appraisal suggested that given that Shapiro might be near retirement, no developmental plans were identified for him.

In mid-1994, the combat vehicle unit of Textron's Cadillac Gage Division was realigned for production in New Orleans; as a result, Textron reassigned and transferred a number of personnel. Akroyd had served as Cadillac Gage Division's Chief Financial Officer, vice-president, and Controller prior to the merger. Textron claims that in June 1994, it demoted Akroyd--who was then fifty-four (54) years old--and transferred him to New Orleans, where he assumed the position of Director of Financial Services of the newly merged division, now known as Textron Marine and Land Systems (hereinafter, "Textron"). Akroyd's new position was at the same pay rate and executive grade level as Shapiro.

From June 1994 through November 1994, Akroyd and Shapiro both reported directly to Kratzer. In late 1994, Textron President John Kelly ("Kelly") made personnel changes, including a reduction in the number of people reporting to Kratzer. As of December 1, 1994, although Shapiro retained his position as Director of Program Planning and Control, he began reporting to

3

Akroyd.

Shortly after the merger Textron underwent a series of "reduction-in-force" and in early January 1995, Kelly and Kratzer advised Textron's Executive Director of Human Resources, Thomas Corcoran ("Corcoran"), of the decision to layoff Shapiro. Corcoran analyzed the layoff lists for possible adverse impact on protected groups and for compliance with Textron's policies, found no adverse impact on protected groups, and confirmed that the layoff complied with Textron's policies.

On January 23, 1995, Kratzer notified Shapiro that he would be laid off, effective January 31, 1995. At the time of the lay off, Shapiro (then seventy-three (73) years old) had for two years drawn a pension from Textron and two former employers, in addition to his salary.

Shapiro was the only Textron employee terminated on January 23, 1995. Corcoran admitted that during 1995 there were "individual" terminations at Textron which were not part of the reduction in force. Corcoran was asked whether the language of Kratzer's September 1994 performance appraisal of Shapiro was an indication of age discrimination by Textron, and admitted that "it depends on how you interpret it." Responding to the Equal Employment Opportunity Commission's ("EEOC") request for information regarding this action, Corcoran denied any discrimination on Textron's part regarding the layoff of Shapiro; however, Corcoran did not send a copy of the September 1994 performance appraisal to the EEOC. In Textron's response to the EEOC, Corcoran reported that Akroyd replaced Shapiro and assumed all of Shapiro's job duties.

Textron maintains that there were legitimate business reasons for laying off Shapiro, including the loss of a contract with the government of Kuwait and a projected drop in 1995 sales.

4

Textron asserts that after his layoff, Shapiro waited approximately four months before he forwarded his resume! to prospective employers. Shapiro maintains that he began a diligent job search after he was notified that he would be fired; that he updated his resume!, monitored newspapers, contacted acquaintances within the industry, registered with headhunters and employment agencies, sent out letters and resume!s to potential employers, and hired a job rehabilitation specialist to help him apply for additional job positions. In affidavit, Textron's rehabilitation specialist, Jennifer Palmer, opined that Shapiro's job search was flawed due to its untimeliness and due to the lack of quantity and quality of contacts whom Shapiro approached. Nathaniel Fentress, Shapiro's rehabilitation specialist, opined that Shapiro's search for employment was reasonable, due to the lack of opportunities for someone his age.

Shapiro filed suit in Louisiana state court against Kelly, Kratzer, and Textron. Textron subsequently removed the action to the United States District Court for the Eastern District of Louisiana. Kelly and Kratzer were dismissed from the case in February 1996.

At trial, at the close of Shapiro's evidence, Textron unsuccessfully moved for judgment as a matter of law. Textron renewed its motion for judgment as a matter of law at the close of all of the evidence, and in response, the district court dismissed Shapiro's failure to promote, failure to rehire, and retaliation claims. The jury then returned a unanimous verdict in Shapiro's favor on the discriminatory termination claim and awarded him back pay of $160,239.48.

After trial, Textron filed a renewed motion for judgment as a matter of law or, alternatively, for a new trial, and Shapiro filed a memorandum seeking reinstatement or, alternatively, front pay if the district court held that reinstatement was not feasible. Shapiro also filed an application for attorney's fees and costs. The district court denied Textron's post-trial

5

motions and entered judgment in favor of Shapiro in the amount of $398,954.93, including attorney's fees in the amount of $60,313.70, back pay in the amount of $160,239.48, and front pay in the amount of $178,401.75, based on Shapiro's work life expectancy of 1.39 years. The parties stipulated to the amount of costs ($5,907.91) to be awarded Shapiro.

Textron appeals the district court's decision: (1) denying Textron's motion for judgment as a matter of law on Shapiro's discriminatory termination claim; (2) in not presenting a special interrogatory to the jury concerning Textron's mitigation of damages defense; and (3) awarding front pay.

II.

ANALYSIS

A.    The Record Contains Sufficient Evidence for a Reasonable Jury to Conclude Shapiro Was Laid Off Because of His Age

1.    Standard of Review

The standard of review applicable to factual issues in an age discrimination case is determined by whether motions for judgment as a matter of law were filed in compliance with Fed. R. Civ. P. 50. When a pre-verdict Rule 50(a) Motion for a Judgment as a Matter of Law and a post-verdict 50(b) Renewed Motion for Judgment are not filed in compliance with the Federal Rules, the appellant waives the right to argue the "insufficiency of the evidence" standard, and the standard of review is "plain error." Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 217-18, 67 S.Ct. 752, 755-56 (1947).

Rule 50(b) reads, in part: "The movant may renew its request for judgment as a matter of law *by filing a motion no later than 10 days after entry of judgment . . . .*" (emphasis added). At

6

trial, Textron moved for a 50(a) motion for judgment at the close of Shapiro's evidence and again at the close of all of the evidence. The jury returned its verdict on November 6, 1996. Textron filed a Rule 50(b) motion for judgment as a matter of law and alternative motion for new trial on November 15, 1996. Textron filed no further Rule 50(b) motion. The district court entered judgment on the jury's verdict on February 4, 1997.

Shapiro argues that Textron did not comply with Rule 50(b), because Textron filed its Rule 50(b) motion within ten days after *the jury's verdict*, instead of within ten days after entry of judgment by the court. Shapiro argues that since Textron did not file or renew its Rule 50(b) motion within ten days after the court entered judgment, on February 4, 1997, Textron did not comply with the Rule and, thus, that the plain error standard of review should apply.

The 1995 Advisory Comments to the 1995 Amendment to Rule 50 ("Comments") explain the meaning of the phrase "no later than 10 days after entry of judgment." The Comments note: "The phrase 'no later than' is used--rather than 'within'--to include post-judgment motions that sometimes are filed before actual entry of the judgment by the clerk."

Textron filed its Rule 50(b) motion on November 15, 1996. This was "no later than 10 days after entry of judgment," in fact, almost three months before entry of judgment by the court. Textron complied with Rule 50(b).

As such, the standard of review is whether there is sufficient evidence on which a reasonable jury could have concluded as it did. <u>Sherrod v. Sears, Roebuck & Co.</u>, 785 F.2d 1213, 1314 (5th Cir.1986). We review the district court's denial of Textron's motion for a judgment as a matter of law under the standard enunciated in <u>Boeing Co. v. Shipman</u>, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc). A "conflict in substantial evidence" must be present to

7

create a question for the jury. Id. at 375. Judgment as a matter of law is only appropriate if the

facts and inferences point so strongly in the movant's favor "that a reasonable jury could not have

concluded that the ADEA was violated." Armendariz v. Pinkerton Tobacco Co., 58 F.3d. 144,

148 (5th Cir.1995) (citing Boeing, 411 F.2d at 374).

        2.      Evidence of Age Discrimination

In order to make a prima facie showing of discriminatory termination due to age, a

plaintiff must demonstrate that: (1) he was discharged; (2) he was qualified for the position; (3) he

was a member of the protected class at the time of the discharge; and (4) he was either replaced

by someone outside of the protected class, replaced by someone younger, or otherwise discharged

because of his age. Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 957 (5th Cir.1993).

The parties extensively analyze the evidence under the framework enumerated in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25 (1973). The

framework involves a burden shifting analysis: (1) the plaintiff must demonstrate a prima facie

case of discrimination; (2) the burden of production shifts to the employer to establish a legitimate

and nondiscriminatory basis for the adverse employment decision; and (3) the plaintiff must then

prove by a preponderance of the evidence that the employer's proffered reason is pretext.

McDonnell Douglas, 411 U.S. at 802-04, 93 S.Ct. at 1824-25.

Textron argues that Shapiro failed to make out a prima facie case of discrimination.

However, we have noted that whether a plaintiff made out:

> a prima facie case of age discrimination . . . is not the correct focus of our review.
> When a case has been fully tried on the merits, the adequacy of the showing at any
> stage of the McDonnell Douglas framework is unimportant; rather, the reviewing
> court must determine whether there was sufficient evidence from which a
> reasonable trier of fact could have concluded that age discrimination occurred. To
> make this determination, we must examine the sufficiency of both the direct and

circumstantial evidence to support the jury verdict that the employer used age as a determinative factor in making the adverse employment decision. Although age need not be the sole reason for the adverse employment decision, it must actually play a role in the employer's decision making process and have a determinative influence on the outcome.

Woodhouse v. Magnolia Hospital, 92 F.2d 248, 253 (5th Cir.1996) (internal citations omitted). See also Weaver v. Amoco Production Co., 66 F.3d 85, 87 (5th Cir.1995).

An analysis of the evidence presented at trial reveals that Shapiro presented sufficient evidence from which a reasonable jury could have concluded that age discrimination occurred.

Kratzer wrote in his 1991 appraisal of Shapiro's performance that: "Mr. Shapiro's job performance certainly indicates that he is promotable to a higher level position in program management, however, his age is a factor in this consideration. It is noted that considering the age factor, Mr. Shapiro's longer-term opportunities for promotion are somewhat limited." In the same 1991 appraisal, Kratzer noted: "There are no qualified replacements within the organization and the Division is currently searching for a manager who can be developed to succeed Mr. Shapiro." However, Shapiro stated that at that time, he had indicated no desire to retire.

Further, in his May 1992 appraisal of Shapiro's performance, Kratzer wrote: "Would desire that Mr. Shapiro accelerate the development of a qualified replacement."

In the September 1994 performance appraisal of Shapiro, Kratzer suggested that "Mr. Shapiro may be near retirement and would not be considered for further promotion" and that no developmental plans were identified for him. Again, Shapiro alleges that he had no plans for retirement at that time, and Kelly testified at trial that there was no policy at Textron requiring Shapiro to retire. When asked whether such language in the 1994 appraisal could be indicative of age discrimination, Corcoran admitted, "it depends on how you interpret it."

9

We believe that a reasonable jury could find that the language in the performance appraisals suggests that Textron closely regarded Shapiro's age and was watchful for someone--a younger person--who could assume Shapiro's job duties, Akroyd. Further, a reasonable jury could find--in light of the language in the performance appraisals--that the termination of Shapiro evidenced age discrimination by Textron, especially given the fact that Textron had no policy requiring Shapiro to retire and given Shapiro's assertion that he had no plans to retire.

Based on the trial testimony, a reasonable jury could have concluded that Textron's alleged business reasons for terminating Shapiro were pretextual. Textron claimed that its Marine & Land Systems division had a $40 million projected revenue decline shortly before the January 1995 layoff and that its projected revenue declined from $215 million to $175 million. Further, at trial, Kelly testified that the delay and/or loss of a contract which Textron had with the government of Kuwait was another reason for laying off Shapiro. See Trial Transcript ("Transcript"), pp. 245-47.

However, the cross examination of Kelly and Kratzer at trial, and the testimony of Shapiro, demonstrated that there was great uncertainty about whether the $40 million revenue decline had even been projected by the time that Shapiro was fired. See Transcript, pp. 58-63, 261-71. Testimony also demonstrated that in January 1995, the month that Shapiro was fired, Textron was still in negotiations with the government of Kuwait regarding their contract. Id. at pp. 261-71, 360-61. In sum, a reasonable jury could have found that the supposed legitimate business reasons offered by Textron for its termination of Shapiro were pretextual.

Judgment as a matter of law is only appropriate if the facts and inferences point so strongly and overwhelmingly in the movant's favor "that a reasonable jury could not have

10

concluded that the ADEA was violated." Armendariz, 58 F.3d. at 148. A reasonable jury could indeed have concluded that the ADEA was violated. The district court's decision denying Textron's motion for judgment as a matter of law was not in error.

B.        The District Court Did Not Commit Error in Choosing Not To Present a Special Jury Interrogatory Concerning Textron's Mitigation of Damages Defense

Textron argues that the district court committed reversible error by not presenting an interrogatory to the jury concerning Textron's mitigation of damages defense. Under Fed. R. Civ. P. 49, district courts are given broad discretion in the formulation of jury interrogatories. As such, we review the adequacy of the formulation of jury interrogatories under an "abuse of discretion" standard. EEOC v. Manville Sales Corp., 27 F.3d 1089, 1096 (5th Cir.1994), cert. denied, 513 U.S. 1190, 115 S.Ct. 1252 (1995).

In determining the adequacy of jury verdict forms, we examine: "(1) whether read as a whole and in conjunction with the general charge the interrogatories adequately presented the contested issues to the jury; (2) whether the submission of the issues to the jury was 'fair'; and (3) whether the 'ultimate questions of fact' were clearly submitted to the jury." Barton's Disposal Serv., Inc. v. Tiger Corp., 886 F.2d 1430, 1435 (5th Cir.1990), quoting Dreiling v. General Elec. Co., 511 F.2d 768, 774 (5th Cir.1975). "Abuse of the discretion is established if the Charge and Interrogatories fail to meet [these] factors." Barton's, 886 F.2d at 1435. "An alleged error in the charge is reversible only if the charge, when viewed in its entirety, misstated the state substantive law and thereby prejudicially misled the jury." Nance v. Gulf Oil Corp., 817 F.2d 1176, 1180 (5th Cir.1987).

We find that the district court's charge to the jury contained the relevant law concerning

11

mitigation of damages; therefore, a separate interrogatory to the jury was not needed on the issue. Judge Carr's charge met the three factors discussed above. The trial court did not abuse its discretion.

C.     The District Court Did Not Abuse Its Discretion in Awarding Front Pay to Shapiro

We review a district court's award of front pay for abuse of discretion. Deloach v. Delchamps, 897 F.2d 815, 822 (5th Cir.1990).

Under the ADEA, reinstatement is generally the preferred remedy. Id. at 822. However, front pay may be awarded "to meet the goal of Title VII to make whole the victims of discrimination." Floca v. Homecare Health Serv., Inc., 845 F.2d 108, 112 (5th Cir.1988). Though Shapiro argued in a post-trial memorandum for his reinstatement, instead of front pay, the district court held that reinstatement was not feasible in this case, given that: (1) Shapiro's work-life expectancy was only slightly over one year; (2) Shapiro's former job position was not available; and (3) there was animosity between Shapiro and others with whom he would have worked if he had been reinstated. As such, the trial court found that front pay was a more appropriate remedy, and awarded front pay of $178,401.75, based on Shapiro's work life expectancy of 1.39 years.

Textron argues that the trial court's front pay award was an abuse of discretion because: (1) it is not clear from the record that Shapiro would have remained in his position but for the unlawful discrimination; and (2) the award did not include any reduction for Shapiro's post-termination pension and retirement earnings.

Textron argues that it is uncertain whether Shapiro would have remained in his position, but for the unlawful discrimination. Textron argues that Shapiro's work life expectancy of 1.39

12

years is speculative, because Shapiro could have lost his position in a reduction in force and because Textron had no position for someone with Shapiro's skills. The jury concluded that Shapiro was laid off because of age discrimination. As such, we will not give credence to an argument that speculative forces in the victim's future could have endangered his employment, and that his work life expectancy should be reduced. What is clear from the jury's verdict is that Shapiro would have continued to work for Textron, but for Textron's age discrimination. As such, the district court did not abuse its discretion in awarding front pay based on Shapiro's work life expectancy of 1.39 years.

Finally, Textron urges that we order a remittitur of the front pay award because Shapiro received significant earnings after his termination. The evidence demonstrated that after his termination, Shapiro received income from social security, from pension benefits from Textron and from two former employers, and from stock benefits. However, the evidence at trial demonstrated--and Textron does not dispute--that had Shapiro not been terminated, he would have received all of these benefits in addition to his Textron salary.

As we also have upheld a trial court's failure to deduct social security benefits, the district court did not abuse its discretion in not deducting Shapiro's social security benefits from the front pay award. Guthrie v. J.C. Penney Co., Inc., 803 F.2d 202, 209 (5th Cir.1986); see also Dominguez v. Tom James Co., 113 F.3d 1188 (11th Cir.1997).

As to a plaintiff's post-termination income from third parties, we have adopted the "collateral source" rule, which provides that "a plaintiff's recovery is not to be reduced by benefits received from a third party." Smith v. Office of Personnel Management, 778 F.2d 258, 263 (5th Cir.1985), cert. denied, 476 U.S. 1105, 106 S.Ct. 1949, (1986). "The collateral source rule does

13

not apply when the collateral source is the defendant." Id.   As such, the district court did not abuse its discretion by not reducing the front pay award by the amount of Shapiro's retirement investments, such as stock, and by the amount of Shapiro's pensions from employers other than Textron.  As the collateral source rule does not apply when the source of funds is the defendant, the rule will not apply to the Textron pension, which must be examined separately.

The evidence at trial indicated that Shapiro began receiving his Textron pension and his pensions from two past employers *before* he was terminated.  See Transcript, pp. 90-91.  Textron cannot argue that Shapiro's pension payments would not have existed, but for his termination. Further, Textron has not argued on appeal that the amount of Shapiro's pensions increased as a result of his termination.  As such, the post-termination pension payments to Shapiro--in addition to the front pay award--were not a windfall to him.  The trial court did not abuse its discretion.

## III.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is in all respects AFFIRMED.